UNITED STATED BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO
Honorable Howard R. Tallman

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| **DWIGHT KENT POTTS,** | ) | Case No. 11-22624 HRT |
| | ) | Chapter 7 |
| **Debtor.** | ) | |
| | ) | |
| | ) | Adversary No. 11-01592 HRT |
| **BLACKWELL OIL COMPANY, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| **DWIGHT KENT POTTS,** | ) | |
| | ) | |
| **Defendant.** | | |

## ORDER ON COMPLAINT OBJECTING TO DISCHARGE

THIS MATTER comes before the Court on the complaint filed on August 29, 2011 by Plaintiff Blackwell Oil Company ("Blackwell") against Debtor alleging claims for denial of discharge under 11 U.S.C. §§727(a)(3), (a)(4)(A), (a)(4)(D), and (a)(5).[1]  A two-day trial was held on January 28 and 29, 2013.  At the conclusion of trial, the Court ordered the parties to submit written closing arguments, which were timely filed.  The Court is now ready to rule.

I.  Background.

Debtor, represented by counsel,[2] filed for Chapter 7 on May 26, 2011.  On Schedule A, he listed a residence at 24 Little Baldy Circle, Fairplay, Colorado (the "Residence") valued at

---

[1]  The complaint initially alleged an additional claim under § 727(a)(6)(A), but that claim was withdrawn in Blackwell's Reply Closing Argument (docket #47).

[2]  There were three attorneys involved at times with Debtor's case.  Mr. Robert Padjen represented Debtor during his bankruptcy filing and prepared Debtor's original and amended schedules.  Mr. Harold Bruno previously represented Debtor during state court litigation between Blackwell and Debtor's company, Sunbo Corporation.  Mr. Bruno entered his appearance for Debtor in this adversary proceeding in September 2011.  Mr. Bruno withdrew in October 2012 and was replaced by Mr. Forrest Morgan, who represented Debtor at trial, where both Mr. Padjen and Mr. Bruno testified as witnesses.

$475,000, encumbered by a secured debt of $391,519.91, and a commercial real property located at 379 Highway 285 in Fairplay ("Commercial Property") valued at $350,000, encumbered by a secured debt of $366,480.20. On Schedule B, Debtor listed $54,653.80 in personal property (with $48,973 of that in an exempt IRA), including $635 in household goods and $100 in books/photos. Debtor scheduled a $500,000 disputed unsecured "trade debt" to Blackwell on Schedule F. There were no leases disclosed on Schedule G. Schedules I & J showed monthly income of $2,400 and monthly expenses of $2,380. In his statement of financial affairs, he disclosed his interest in Sunbo Corporation ("Sunbo") from December 1986 to November 2008.

      Blackwell moved for a Rule 2004 examination of Debtor on June 24, 2011. Three days later, Debtor amended his Schedule G to include two leases relating to the Commercial Property: One with his parents, Jerry and Katherine Potts (the "Potts"), and one with Thomas and Johnelle Halt and their company, Haltstop (collectively "the Halts"). The meeting of creditors was held on June 30, 2011. On August 3, 2011, Debtor amended his Schedule B to add $385 worth of "pictures, prints, and vases" and also listed a coffee table, end table, Mexican plates, and "misc. items left by a former girlfriend" valued at $80. Debtor's Rule 2004 examination was conducted on August 4, 2011. On August 29, 2011, Debtor filed an amended statement of financial affairs that showed a $5,000 increase in income for the relevant years, and listed the "coffee table, end table, Mexican plates and misc. items" under Line 14 as property held for another person, Debtor's former girlfriend.

      Blackwell then filed this adversary proceeding, alleging the following:

      1. Debtor was the sole owner of the Commercial Property and also the sole officer, director and shareholder of Sunbo, which operated the "Grubb and Stuff" gas station and convenience store in the Commercial Property. Blackwell provided fuel to Sunbo for over twenty years, until Sunbo stopped paying Blackwell the entire amount due for fuel. In October 2006, Blackwell filed suit against Sunbo in state court. After a four-day trial held in September 2008, judgment entered in favor of Blackwell and against Sunbo for $344,892 on December 22, 2008.[3]

      2. In October 2008, Sunbo sold Grubb and Stuff's furniture, fixtures, equipment, inventory, supplies and intangibles to the Halts, who had been employed by Sunbo since

---

[3] In Debtor's bankruptcy case, Blackwell filed proof of claim 2-1, in the amount of $430,830.69, on May 9, 2012. Attached to the proof of claim was a statement that "Creditor supplied petroleum products to Debtor without payment 2004-2006, see attached State Court Complaint, see amortization of judgment awarded in Case No. 2006 CV 269." No judgment was attached. The "State Court Complaint" attached was the amended complaint filed in a second action, 2010 CV 232, wherein Blackwell sued Debtor, Sunbo, and others in state court in August 2010. The only other documents attached to the proof of claim was an amortization schedule for the $344,892 claim amount at 18% interest from December 2008. No objections have been filed to Blackwell's proof of claim.

approximately 2006, for $30,000. (Exhibit 15). The Halts paid $10,000 up-front and agreed to pay the remainder in installments under a promissory note. The Halts also agreed to lease the property from Sunbo. The Halts have not paid the remaining $20,000 owed.

  3. In August 2010, Blackwell sued Debtor, Sunbo, and the Halts in state court, alleging breach of fiduciary duty, unjust enrichment, alter ego, fraudulent transfer, civil conspiracy, and constructive trust. Trial was scheduled for June 7 to June 10, 2011. Debtor filed for bankruptcy 12 days before trial, and the state court action was stayed.[4]

  4. Debtor listed the Residence for sale from April 2, 2009 through May 18, 2010, at a price of $1,300,000, but listed it for sale after the petition date at $599,000.

  5. The true value of the Commercial Property is $700,000, not $350,000.

  6. The Debtor failed to disclose leases on the Commercial Property in his original filing, and failed to list income he received under the leases.

  7. The Debtor misrepresented the amount of income he earned in his statement of financial affairs and schedules.

  8. At the meeting of creditors, the Debtor, when asked about an "Aztec calendar" in the Residence, stated he paid $2,000 for it, but did not disclose it in his schedules.

  9. Debtor failed to produce documents requested in a subpoena.

  10. At his Rule 2004 exam Debtor stated that an apartment above the Grubb and Stuff was rented out to a Jean Hackman for $720 per month, but neither the lease nor the income was disclosed on his schedules.

II. Discussion

  A. Standing.

 At the outset, the Court must determine whether Blackwell has standing as a creditor in this case. A "creditor" includes an "entity that has a claim against the debtor," and a "claim" is a "right to payment." *In re Miller*, 666 F.3d 1255, 1262 (10th Cir. 2012). It is undisputed that the judgment obtained by Blackwell in state court is against Sunbo, not against Debtor. The second state court action brought by Blackwell against Debtor personally was stayed due to Debtor's bankruptcy filing. Therefore, Debtor asserted during the trial that Blackwell has a right to payment from Sunbo, but not necessarily from Debtor.

---

[4] No party requested relief from the bankruptcy stay to complete the state court trial.

Under § 101(5)(A), the term "claim" includes a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." *See Johnson v. Home State Bank*, 501 U.S. 78, 83 (1991) ("Congress intended by this language to adopt the broadest available definition of 'claim.'"). In his written closing argument, Debtor states:

> Blackwell has a judgment against Sunbo, but no present legal right to collect any money from [Debtor]. While Blackwell may have standing to assert claims under Section 727 as a claimholder under the very broad definition of 11 U.S.C. § 101(5)(A), if Blackwell were to proceed to state court and lose, [Debtor's] assertion that Blackwell has neither a claim nor status as a creditor would be validated.

Debtor's own analysis shows that for purposes of this proceeding, Blackwell has standing to pursue the denial of Debtor's discharge. Standing in this Court cannot be dependent on a claim subject to determination in state court. *See In re Bailey*, 375 B.R. 410 (Bankr. S.D. Ohio 2007) (the disputed nature of a debt incurred by non-debtor corporate entity did not bar creditor from seeking denial of debtor's discharge, where debtor paid personal bills out of the corporate account and creditor had sued debtor individually in state court).

B. Causes of Action

Section 727(a) of the Bankruptcy Code provides, in part, that the Court shall grant a debtor a discharge, unless:
. . . .

(3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case; or

(4) the debtor knowingly and fraudulently, in or in connection with the case--
  (A) made a false oath or account;
  . . . . ; or
  (D) withheld from an officer of the estate entitled to possession under this title, any recorded information, including books, documents, records, and papers, relating to the debtor's property or financial affairs; or
. . . .
(5) the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities.

11 U.S.C. § 727(a)(2)-(5). A party objecting to a discharge need only prove one of the grounds for non-dischargeability under § 727(a) because these provisions are phrased in the disjunctive. *In re Garland*, 417 B.R. 805, 810-11 (10th Cir. BAP 2009). Proof of any one of the subsections is enough to justify the denial of a debtor's discharge. *Id.*

1. § 727(a)(3)

To deny Debtor's discharge under § 727(a)(3), Blackwell must show by a preponderance of the evidence that Debtor "failed to maintain and preserve adequate records and that the failure made it impossible to ascertain his financial condition and material business transactions." *Gullickson v. Brown (In re Brown)*, 108 F.3d 1290, 1295 (10th Cir. 1997). Section 727(a)(3) does not require a debtor to provide perfect or even complete records. "Records need not be so complete that they state in detail all or substantially all of the transactions taking place in the course of the business. It is enough if they sufficiently identify the transactions that intelligent inquiry can be made respecting them." *Hedges v. Bushnell*, 106 F.2d 979, 982 (10th Cir.1939). In general, a higher standard of recordkeeping will be required, as a prerequisite to discharge, of Chapter 7 debtors who are sophisticated business persons. *In re Luby*, 438 B.R. 817, 832 (Bankr. E.D. Pa. 2010). Considerations which are relevant in evaluating the adequacy of debtor's records include the debtor's occupation, financial structure, education, experience, sophistication, and any other circumstances that should be considered in interest of justice. *In re Strbac*, 235 B.R. 880, 882 (6th Cir. BAP 1999).

At trial, Debtor testified that he had a high school education and relied heavily on his bookkeepers and an accountant to maintain financial records. The parties agreed that the majority of Sunbo's bookkeeping was done by Johnell Halt. At trial, Blackwell submitted a 14-page report from Harrison, P.C., in which Joshua G. Harrison, CPA, evaluated the "combined books and financial records of Sunbo Corporation, Dwight Potts, and the Halts both prior to and following the October 2008, asset sale." In that report, Harrison wrote, "I note that a substantial share of Sunbo's 2008 increasingly complex bank transactions involved Sunbo's bookkeeper, Johnell Halt" (Exhibit 8, at 9). Mr. Harrison also testified at trial that he had obtained sufficient recorded information, including books, documents and records, from which he was able to ascertain both the Debtor's financial condition and the business transactions of Sunbo. This directly contradicts Blackwell's assertion that Debtor failed to produce necessary documents. *See In re Phouminh*, 339 B.R. 231, 241 (Bankr. D. Colo. 2005) (noting that the quantum of evidence submitted by the party seeking denial of discharge undercut his allegation of a failure to maintain records).

Blackwell further contended that Debtor failed to provide specific relevant financial documents; for instance, in closing argument, Blackwell stated that Debtor had "never" provided documentation of his leases with the Potts or the Halts. However, Debtor responded that copies of the leases were already provided to Blackwell during state court litigation, and this was corroborated by the evidence. Additionally, at the trial, Debtor's former counsel, Mr. Bruno, testified that, in connection with the state court litigation, Debtor and/or Sunbo produced more

than 6,000 pages of documents that included financial records. This was corroborated by Debtor's Exhibit L, which was a detailed listing of documents provided to Blackwell during the state court litigation. While many of these documents related to the operation of Sunbo, they also included Debtor's tax returns from 2004 to 2008 and Debtor's bank statements for a Colorado East Bank account from 2007 to 2010.

Blackwell also complained that, in connection with the Rule 2004 subpoena, Debtor produced minimal or no information concerning his credit card statements, mortgage statements, and Bank of America account, and it was only through the efforts of Blackwell and the Trustee the information was eventually obtained. Nevertheless, Blackwell accepted the production of information and never sought to compel any further production of documents. At trial, Mr. Padjen testified he had participated in responding to the subpoena and in supplying all documents in the Debtor's custody or control to Blackwell. Additionally, Mr. Bruno testified that in the course of nearly five years of litigation with Blackwell, he had produced thousands of pages of financial information, not only from Debtor, but also from Debtor's parents, Debtor's accountants, and other third parties. It is true a "mountain of paper" does not necessarily fulfill a debtor's duty under § 727(a)(3); but, in this case the documents produced not only allowed Blackwell's expert to ascertain Debtor's financial condition, the Trustee also testified he was sufficiently advised about the Debtor's financial affairs. The Court, after reviewing all the evidence, concludes Blackwell did not meet its burden to show that Debtor made it impossible to ascertain his financial condition, as required for denial of discharge under § 727(a)(3).

2. § 727(a)(4)(A)

11 U.S.C. § 727(a)(4)(A) provides that "[t]he court shall grant the debtor a discharge unless the debtor knowingly and fraudulently, in or in connection with a case made a false oath or account." To deny Debtor's discharge under this section, Blackwell must show by a preponderance of the evidence that Debtor "knowingly and fraudulently made an oath and that the oath relates to a material fact." *In re Brown*, 108 F.3d at 1294. The elements that must be proven are: (1) the debtor made a statement under oath; (2) the statement was false; (3) the debtor knew the statement was false; (4) the debtor made the statement with fraudulent intent; and (5) the statement related materially to the bankruptcy case. *In re DiGesualdo*, 463 B.R. 503, 522 (Bankr. D. Colo. 2011). "The subject matter of a false oath is 'material,' and thus sufficient to bar discharge, if it bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property." *In re Garland*, 417 B.R. 805, 814 (10th Cir. BAP 2009).

Blackwell alleges Debtor made a false oath or account when he filed his bankruptcy petition, as well as during his Rule 2004 exam and § 341 meeting of creditors. The allegations include statements made concerning (1) his income; (2) the value of the Commercial Property; (3) the value of the Residence; (4) the value of personal property; and (5) the leases on the Commercial Property.

      (a)    <u>Income</u>.

Blackwell notes that on his initial statement of financial affairs, filed on May 26, 2011, Debtor listed income of $13,003 in 2009, $36,616 in 2010, and $600 in 2011, for a total of $50,219.[5] Blackwell contends that at the § 341 meeting,[6] Debtor testified he had received all the pre-petition rent payments owed to him by the Halts, but did not disclose the payments as income, and that at the Rule 2004 exam, Debtor revealed he had received $720 per month from Jean Hackman as rent for the apartment above the Grubb and Stuff, but never disclosed this as income. In its closing argument, Blackwell argues that Debtor should have disclosed more income from the Halt lease (at least $49,000) and the Hackman lease (at least $12,000).

At trial, the attorney who filed Debtor's schedules, Mr. Padjen, testified that he would not consider payments from the Hackman lease as income, due to the termination of the lease and the fact that there were offsetting maintenance and operating costs associated with rental of the apartment above the store. He also did not consider payments under the Halt lease to be income, because the payments were intended as a pass-through to assure that the first mortgage lender was timely paid, and there was no net income to Debtor. Mr. Padjen also testified after he received Debtor's tax returns, he amended Debtor's schedules to correspond with the tax documents. The Court found this testimony to be credible, and finds no false oath was made regarding Debtor's income.

      (b)    <u>Commercial Property.</u>

Debtor recognized at the time of filing he would not retain ownership of the Commercial Property, by filing a Statement of Intention to surrender it. At trial, the Trustee testified he would not have sold the Commercial Property unless he could get a price sufficient to pay all mortgages and closing costs and also allow the estate to recover money from the sale of the Commercial Property.

Mr. Padjen testified that when he met with the Debtor and his parents, they did not know the value of the Commercial Property. He asked them to provide him with additional information. Mr. Jerry Potts then testified that based on those instructions, he contacted a real estate broker, Ms. Bonnie Dallas, who informed him the value of the Commercial Property for a "quick sale" in the context of bankruptcy was around $350,000. That is the value the Debtor included in Schedule A.

---

[5] Debtor amended his schedules on August 29, 2011, to reflect slightly more income: $30,595 in 2009, $22,767 in 2010, and $2400 in 2011, for a total of $55,762.

[6] In its closing argument, Blackwell includes Debtor's testimony during the § 341 meeting even though the § 341 meeting transcript was not admitted into evidence at trial.

The Trustee also testified the first offer he received to purchase the Commercial Property was from Blackwell and was in the "low four hundred thousands." He also received another offer for around $400,000 from an independent developer. These offers are closer to the $350,000, estimated by the Debtor, than the $700,000 value Blackwell has asserted in this case.[7] The Commercial Property eventually was sold to Blackwell for $625,000. The Court agrees with Debtor that Blackwell was willing to pay a premium for the Commercial Property because it had been providing fuel to the facility for years and that relationship was terminated as a result of the litigation. Blackwell's decision to buy the Commercial Property at a premium does not lead the Court to conclude that Debtor purposely undervalued the Commercial Property in his petition.

        (c)      Residence.

Debtor scheduled his Residence with a value of $475,000. The Trustee eventually sold the Residence for $542,500 in September 2011. At trial, Blackwell made much of the fact the Residence was listed for over a million dollars in 2009, two years prior to the Debtor's bankruptcy filing. Yet in closing argument, Blackwell admits "it is true, prior to the petition date, Debtor had not been able to sell the Residence, probably because it was priced too high, and that at some time before the petition date, Debtor cut the listing price to $599,000." All parties testified the real estate market in Fairplay was subject to downturns during the relevant time period. Debtor testified credibly he had no experience in real estate valuation, and his testimony was supported by Mr. Padjen's testimony that Debtor told him he had no idea what the value of the Residence was. The Court cannot either find or deduce from the evidence that the Debtor knowingly and fraudulently sought to mislead the Court or creditors in valuing the Residence. A false oath caused by mere mistake or inadvertence is not sufficient to bar a debtor's discharge. Nor is an honest error or a mere inaccuracy. *See Brown*, 108 F.3d at 1294–95, *DiGesualdo*, 463 B.R. at 522.

        (d)      Personal Property.

Blackwell asserts Debtor intentionally tried to hide an "art collection" that was eventually sold by the Trustee for $7,792 in December 2011. The items included clay plates and pottery from Mexico and some prints.[8] The plates and pottery were sold at prices ranging from $16 to $310. While one of the prints ended up being sold for $2,400, the remaining prints sold for between $105 and $875. (Exhibit 30). At trial, Debtor testified some of the items in question were over 20 years old, some had belonged to a former girlfriend, and he did not think they were very valuable. Debtor also testified he was told to list the property at "garage sale" value on his

---

[7] That value appears to be based in part on a Park County Assessor printout, dated October 17, 2012, for $713,477 (Exhibit 35). Debtor filed for bankruptcy, however, in May 2011 and there is no evidence of the assessed value at that time.

[8] There also was some testimony about an "Aztec calendar" that apparently was lost by the auction company. Insurance proceeds of $500 on that item went to the estate.

Petition. Mr. Padjen testified he did not know if some art items belonged to Debtor or to Debtor's former girlfriend, and was thus unsure how to list them on the bankruptcy schedules. Some of the items were eventually listed on Debtor's schedules as "property held for another person."

Debtor was questioned at length about the "art collection" during his § 341 meeting. Yet, even after the meeting, he still believed the items were of nominal value when he amended his Petition, with the assistance of counsel, to include "$385 in vases and prints." A false statement "resulting from ignorance or carelessness does not rise to the level of 'knowing and fraudulent' sufficient to deny a discharge." *DiGesualdo*, 463 B.R. at 522. At the time of the amendment, Debtor also knew arrangements were being made for the Trustee to sell the items to benefit the estate, and there was no reason to fabricate the value of the property. In fact, the Trustee testified he received full cooperation from Debtor and his parents in administering the property. Debtor's parents, at their expense, personally delivered all of the requested property directly to the Trustee. The Court, after hearing all of the parties' testimony during trial and having had the opportunity to judge their credibility, determines that Debtor did not "knowingly and fraudulently make a false oath relating to a material fact" concerning the personal property.

    (e)  <u>Leases.</u>

Blackwell correctly notes Debtor did not list any leases in his original bankruptcy filing. However, Debtor filed an Amended Schedule G one month later, before either the meeting of creditors or Rule 2004 exam was conducted, to include both the Halt lease and the Potts lease. Mr. Padjen testified the Hackman lease was not scheduled because Ms. Hackman had passed away and the lease was no longer in effect. He also testified about his understanding that expenses of the tenancy offset any rent paid prior to her death.[9]

As a matter of law, "no inference of fraudulent intent can be drawn from an omission when the debtor promptly brings it to the court's or trustee's attention absent other evidence of fraud." *In re Brown* at 1294. Further, "[t]he fact that a debtor comes forward with omitted material of his own accord is strong evidence that there was no fraudulent intent in the omission." *Id.* Here, Debtor amended his schedules to include the leases before the meeting of creditors, before the Rule 2004 exam, and before Blackwell initiated the adversary proceeding. Thus, the amendment to include the leases was not "offered only as a result of developments during the meeting of creditors, after the debtor knew the 'cat was out of the bag'" as in *In re Mellor*, 226 B.R. 451 (D. Colo. 1998) cited by Blackwell.

---

  [9] Blackwell never introduced any evidence concerning the Hackman lease other than Debtor's testimony at his Rule 2004 exam that he received rent from her in 2010 and for part of 2011.

In conclusion, the Court finds that Blackwell did not prove all the elements required under § 727(a)(4)(A) to deny Debtor a discharge under that section. Debtor's statements were made under oath, and some of them were not accurate; however, Blackwell did not show that Debtor knew at the time they were false or that he made them with fraudulent intent. Moreover, an objection to discharge because of a false oath or account should not apply to minor errors. *See In re Dupree*, 336 B.R. 498, 502 (Bankr. M.D. Fla. 2005) (a court should analyze a debtor's omissions or nondisclosures as to whether they were part of a scheme to retain assets for his own benefit at the expense of his creditors). Here, at all times Debtor intended to surrender the Residence and Commercial Property, and cooperated with the Trustee in liquidating his assets. Further, Blackwell's purchase of the Commercial Property will likely benefit Blackwell, both in terms of the value of the property and the opportunity to produce future income.

3.   727(a)(4)(D)

This section provides that "[t]he court shall grant the debtor a discharge unless the debtor knowingly and fraudulently, in or in connection with a case withheld from an officer of the estate entitled to possession under this title, any recorded information, including books, documents, records, and papers relating to the debtor's property or financial affairs." The only officer of the estate in this case was the Trustee, who did not file an action against Debtor or join in this claim filed by Blackwell. At trial, the Trustee testified that he was satisfied with the information received from Debtor in his schedules, at the meeting of creditors, and through the cooperation of Debtor's family. On cross examination the Trustee was specifically asked if he believed Debtor had withheld any recorded information relating to Debtor's property or financial affairs, and responded in the negative. This claim therefore is not supported by the evidence.

4.   727(a)(5)

Section 727(a)(5) provides that the Court shall grant a discharge, unless "the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities." A party objecting to a debtor's discharge under § 727(a)(5) has the burden of proving facts establishing that a loss or shrinkage of assets actually occurred. Once the objecting party meets its initial burden of proof, the burden then shifts to the debtor to explain the loss or deficiency of assets in a satisfactory manner. *Cadle Co. v. Stewart (In re Stewart)*, 263 B.R. 608, 618 (10th Cir. BAP 2001). It is not necessary for a party objecting to discharge under § 727(a)(5) "to prove, or even allege, fraudulent acts or a corrupt motive on the part of the debtor." *Phouminh,* 339 B.R. at 247.

At trial, Blackwell presented testimony and evidence, through its expert Mr. Harrison, that as much as $1.4 million[10] was unaccounted for in Sunbo's business during the period from 2004 to 2008. Blackwell alleged this money was pocketed by Debtor, and, but for the

---

[10] Mr. Harrison did acknowledge, under cross exam, that approximately half of that amount could have been used to purchase inventory.

withdrawal of this money, Sunbo would have been profitable and able to pay its bills to Blackwell.  Blackwell also asserted a dissipation in assets occurred due to the transfer of Sunbo's assets, shortly after a trial in the action by Blackwell against Sunbo, to the Halts for $30,000 in the Asset Purchase Agreement (Exhibit 15).  Based on Mr. Harrison's report, Blackwell contends the true value of Sunbo was between $200,000 and $300,000, and that Debtor sold Sunbo's assets to the Halts for a fraction of their value.

In closing argument, Debtor responds that Blackwell has not shown that at a time not "too remote" to the filing of the bankruptcy, Debtor had a "substantial identifiable asset" that would have belonged to the bankruptcy estate, but did not possess that asset as of the petition date, citing *Menotte v. Hahn (In re Hahn)*, 362 B.R. 542 (Bankr. D. Fla. 2007).  Debtor does not cite any authority to aid this Court in quantifying what is "remote in time," however.[11]  One court has noted that a two-year time period prior to the petition date is common.  *In re Lindemann*, 375 B.R. 450, 472  (Bankr. N.D. Ill. 2007) (collecting cases).  Inquiries beyond that period may be warranted.  *See, e.g., In re D'Agnese*, 86 F.3d 732 (7th Cir. 1996)(expanding the focus to nine years pre-petition).  "The exact time a court should look back depends on the case; there is no hard and fast rule."  *In re Olbur*, 314 B.R. 732, 741 (Bankr. N.D. Ill. 2004)*.*

Debtor contends that the losses identified by Blackwell's expert are too remote in time, because they occurred during the period from 2004 to 2008, and Debtor did not file bankruptcy until May 2011.  Blackwell argues, however, that the loss is not too remote in time, because Blackwell timely brought its claims against Sunbo in state court in 2006.  And, in October 2008, after a four-day trial but before judgment had entered against Sunbo, Debtor, who had a 100% interest in Sunbo, transferred all Sunbo's assets to the Halts, for significantly less than their value.  Debtor's only explanation for selling Sunbo's assets to the Halts in October 2008 was that he "wanted to get out of the business."  This is not credible in light of the litigation against Sunbo that had just concluded a month before.  After the transfer of assets, Blackwell had to bring a second state court action against Debtor, individually, and the Halts.  At that point, Blackwell's breach of contract judgment against Sunbo had also become a commercial tort claim against the Debtor for his ill-timed and suspect transfer of Sunbo's assets.  On the eve of trial in that second action, Debtor filed for bankruptcy.

---

[11]  In its Reply Closing Argument, Blackwell alleges that the Tenth Circuit has not specifically adopted the "remote in time" requirement, citing *In re Stewart*, 263 B.R. at 608.  In that case, however, the Tenth Circuit Bankruptcy Appellate Panel merely stated that the party objecting to discharge has the burden of proving that a "loss or shrinkage of assets actually occurred."  It does not appear that the issues presented in that case required that Court to address the remote in time requirement.  The Kansas bankruptcy court did address the requirement in *In re Keck*, 363 B.R. 193, 206 (Bankr. D. Kan. 2007), and evaluated whether the losses in question occurred "a relatively short time" before the bankruptcy filing.

If, as Debtor alleges, Sunbo was not really worth the value Mr. Harrison estimated it to be, that was partly due to the unexplained loss of cash bleeding out of Sunbo for several years prior to the state court lawsuits and bankruptcy filing. While the drain on Sunbo's cash and resulting losses did occur over a period of time, the transfer to the Halts occurred in October 2008, the second state court action was brought in August 2010, and the bankruptcy was filed in May 2011. Thus the time period between the transfer of assets and the bankruptcy filing is only slightly more than the typical two-year period, and, in the context of the applicable statutes of limitations for the state court litigation, is not too remote in time.

Based on Mr. Harrison's report and testimony, Debtor substantially diminished the value of Sunbo not only to himself, but also to his creditors. Debtor commingled Sunbo's funds with his personal funds, did not operate Sunbo as a separate corporate entity, and caused Sunbo to be thinly capitalized. All of this misuse of his corporate entity by the Debtor, and probably others, significantly reduced the value of Debtor's 100% ownership interest in Sunbo, which is a substantial identifiable asset. According to Mr. Harrison's report, Sunbo would have been worth between $200,000 and $300,000, but for the skimming of cash and mismanagement that occurred. As Blackwell points out in its Reply Closing Argument, Debtor "does not really dispute that more than $700,000 in unexplained cash was withdrawn from Sunbo between 2004 and 2008." Debtor stated he did not know what happened to the money and admitted he did nothing to investigate its disappearance. The Court concludes that Blackwell met its initial burden to show that Debtor would have had an asset, namely, the true value of his 100% interest in Sunbo, at a time not too remote to his bankruptcy filing, but did not have that asset at the time of filing. Without these large cash depletions, Sunbo would have had a greater ability to meet its obligations and the Debtor's interest in the company would have been enhanced. Even if sold, the Debtor could have commanded a higher price for the company. It follows if the transfer of Sunbo's assets to the Halts had reflected the true value of the business, more money would have been available for the Debtor to pay his creditors as well as those of Sunbo.

The burden thus shifts to Debtor to provide a satisfactory explanation for the loss of assets. In *Phouminh*, this Court stated that "under the provisions of § 727(a)(5), a debtor will not be granted a discharge where it appears to the court that the debtor should have had the resources available to deal fairly with creditors, but is unable to explain the disposition or loss of those assets." *Phouminh,* 339 B.R. at 248. This Court also noted that "an explanation of the Debtor's circumstances in general terms that is merely suggestive of reasons that assets became depleted falls short of the mark." *Id.* (citing *Bell v. Stuerke (In re Stuerke)*, 61 B.R. 623, 626 (9th Cir. BAP 1986)). Additionally, "the court is not concerned with whether the disposition of the assets was proper[12] under the Bankruptcy Code, but rather only whether the explanation satisfactorily describes what happened to the assets." *Sonders v. Mezvinsky (In re Mezvinsky)*,

---

[12] The court is concerned with the truth of the debtor's explanation of what happened to his assets and not the wisdom of the expenditures or dispositions. *See In re Bernstein*, 78 B.R. 619, 623 (S.D. Fla. 1987).

265 B.R. 681, 689 (Bankr. E.D. Pa. 2001). "[E]xplanations of a generalized, vague, indefinite nature such as assets being spent on 'living expenses,' unsupported by documentation, are unsatisfactory. Equally unavailing is mere identification of a person with knowledge, such as an accountant or other individual who handled the financial affairs of the debtor." *Id.*

At trial, Debtor made little, if any, effort to identify where the funds went that were routinely drawn from Sunbo's cash register. While both he and his father testified that others had access to the register and speculated that transient employees could have been responsible for the theft, Mr. Harrison testified that the consistent pattern with which the cash was removed made it unlikely that transient employees would have been responsible. Blackwell asked Debtor a number of questions about the construction of his personal residence, and implied that some of the money missing from Sunbo may have been used for the "luxury" finishes and fixtures in the residence. Debtor did testify that he purchased some items second hand or built things himself, but he presented no documentation for any expenses he incurred building the residence. Even if the money did not actually go to the residence, however, Debtor never gave a satisfactory explanation of where it did go.

What constitutes a satisfactory explanation is a matter of discretion for the court. *Mezvinsky*, 265 B.R at 689. The question is whether the court, "after hearing the . . . explanation has that mental attitude which finds contentment in saying that he believes the explanation.... He no longer wonders. He is contented." *Id.* This Court, after considering all the evidence and testimony in this case, still is left wondering what happened to the missing cash. The Debtor testified it probably went to pay for salaries and for vendor deliveries. Yet, no corroborating evidence, such as a bookkeeper's testimony, adequate supporting journal entries, paid receipts, or invoices were provided. *See, e.g., In re Costello*, 299 B.R. 882, 901 (Bankr. N.D. Ill. 2003) ("The failure to offer any documentary evidence to corroborate a debtor's testimony as to the loss or disposition of assets will justify the denial of discharge"). Thus, the Court cannot say that Debtor has given a satisfactory explanation for the dissipation of assets.

The Court realizes that denial of discharge is a harsh penalty. *DiGesauldo* at 518. Nevertheless, "those who seek shelter of the bankruptcy code must provide complete, truthful and reliable information." *Job v. Calder (In re Calder)*, 907 F.2d 953, 956 (10th Cir.1990). The Court gives Debtor some benefit of the doubt, and if Debtor had come forward with a complete, truthful, and reliable explanation for the loss of Sunbo's assets, and of the Debtor's interest therein, the Court's decision may have gone the other way. Ultimately, however, the Court cannot overlook more than $700,000 in unexplained cash losses and the suspicious timing of the asset transfer to the Halts for little equivalent value. Therefore the Court determines it must deny Debtor his discharge under § 727(a)(5).

III. Conclusion.

      After reviewing the entire record in this case and the applicable law, the Court HEREBY ORDERS that Blackwell's Complaint for denial of discharge under 11 U.S.C. §727(a)(5) is GRANTED. Discharge of Debtor's debts is denied.

      Dated this 14th day of November, 2013.

                                              BY THE COURT:

                                              _____
                                              Howard R. Tallman, Chief Judge
                                              United States Bankruptcy Court